## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| GAYLE ANNETTE GREGORY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) C.A. No. 17-991-CFC-SRF |
| | ) |
| NANCY A. BERRYHILL, | ) |
| Acting Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## REPORT AND RECOMMENDATION

## I.    INTRODUCTION

Plaintiff Gayle A. Gregory ("Gregory") filed this action on July 20, 2017 against the defendant Nancy A. Berryhill, the Acting Commissioner of the Social Security Administration (the "Commissioner"). Gregory seeks judicial review pursuant to 42 U.S.C. § 405(g) of the Commissioner's final decision denying Gregory's claim for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act (the "Act"), respectively. 42 U.S.C. §§ 401–434 and §§ 1381–1383f. The court has jurisdiction over the matter pursuant to 42 U.S.C. § 405(g).

Before the court are cross-motions for summary judgment filed by Gregory and the Commissioner. (D.I. 25; D.I. 26) Gregory seeks review of the Commissioner's decision. (D.I. 25) The Commissioner requests the court affirm the decision of the administrative law judge ("ALJ"). (D.I. 27 at 2) For the reasons set forth below, the court recommends denying Gregory's motion for summary judgment (D.I. 25), and granting the Commissioner's cross-motion for summary judgment (D.I. 26).

## II.    BACKGROUND

### A.    Procedural History

Gregory filed claims for DIB and SSI on September 18, 2013 and October 4, 2013,
respectively, claiming a disability onset date of August 1, 2012. (D.I. 21-5 at 2-13) Her claims
were initially denied on December 23, 2013, and denied again after reconsideration on February
21, 2014. (D.I. 21-4 at 4-7, 12-16) Gregory then filed a request for a hearing, which was held on
March 23, 2016. (D.I. 21-4 at 18-19; D.I. 21-2 at 37-58) Prior to the hearing, Gregory amended
her alleged disability onset date to August 7, 2013. (D.I. 21-5 at 29) On April 1, 2016, ALJ Jack
Penca issued an unfavorable decision, finding that Gregory was not disabled under the Act. (D.I.
21-2 at 21-32) The Appeals Council subsequently denied Gregory's request for review on May
24, 2017, rendering the ALJ's decision the final decision of the Commissioner. (*Id.* at 2-4) On
July 20, 2017, Gregory brought a civil action in this court challenging the ALJ's decision. (D.I.
2) On August 15, 2018, Gregory filed a motion for summary judgment, and on September 14,
2018, the Commissioner filed a cross-motion for summary judgment. (D.I. 25; D.I. 26)

### B.    Medical History

At the time of the ALJ's decision, Gregory was forty-nine years old. (D.I. 21-2 at 26)
Gregory has a college education and previously worked as a caseworker and a teacher's aide.
(*Id.*) The ALJ found Gregory has the following severe impairments: fibromyalgia, status post-
right shoulder repair, obesity, and adjustment disorder. (*Id.* at 23) The amended onset date of
Gregory's impairments is August 7, 2013. (*Id.* at 21)

#### 1.  Mental impairments

Gregory reported that she was first treated in 2009 for depression and anxiety brought on
by her physical health conditions and loss of employment. (D.I. 21-9 at 45) Treatment notes

2

from Lillian V. Kraman-Roach, M.D. from 2011 to 2012 indicate that Gregory suffered from poor sleep, depression, anxiety, and pain which interfered with her functioning. (*Id.* at 9-15) Gregory reported having outbursts and a low stress tolerance. (*Id.* at 13-14) According to Dr. Kraman-Roach, Gregory's medications included Paxil, Ambien, Sonata, Lunesta, Ativan, Percocet, Savella, Adderall, Lyrica, and Trazodone. (*Id.* at 11-14) Dr. Kraman-Roach indicated that Gregory said the medications made her drowsy, and she experienced forgetfulness and difficulty focusing. (*Id.*) Gregory discontinued several of her medications at various points and cancelled or missed some appointments. (*Id.* at 10-11, 15)

On March 12, 2013, Dr. Kraman-Roach completed a disability questionnaire, explaining how Gregory's pain affected her emotionally. (*Id.* at 7) In describing Gregory's treatment history, Dr. Kraman-Roach noted Gregory's forgetfulness and inability to think clearly at times, and described how Gregory is anxious about the future and her functioning is limited. (*Id.*) At the time of the questionnaire, Dr. Kraman-Roach described Gregory's mood as worried and anxious, but identified her attention, focus, and memory as "good." (*Id.*)

Gregory was referred to Joseph Keyes, Ph.D. for a consultative psychological exam on December 13, 2013. (D.I. 21-9 at 44-50) Dr. Keyes observed that Gregory's appearance was appropriate and described her personal hygiene and grooming as excellent. (*Id.* at 45) She did not exhibit unusual, bizarre, or inappropriate behavior during the evaluation, and her speech was clear and easy to understand. (*Id.*) Dr. Keyes did not detect delusional thought processes or hallucinations. (*Id.*) He described Gregory's thinking as clear, organized, and relevant to the situational context, and indicated that her abstract thinking skills were average. (*Id.*) Dr. Keyes indicated that Gregory's remote and intermediate memory were intact, and her immediate or

3

working memory was in the low-average range. (*Id.*) Gregory exhibited adequate attention and concentration during the evaluation. (*Id.*)

Dr. Keyes reported that Gregory's orientation and mental alertness were normal, but he observed that her social and interpersonal skills were somewhat limited, describing her as socially withdrawn. (*Id.* at 45-46) According to Dr. Keyes, Gregory exhibited moderate clinical symptoms of depression and anxiety. Dr. Keyes diagnosed Gregory with an adjustment disorder. (*Id.* at 46)

### 2. Physical impairments

Prior to her amended onset date, Gregory's primary care physician, Dr. Eva Dickinson, completed a pain questionnaire on October 4, 2011. (D.I. 21-7 at 5-6) Dr. Dickinson opined that Gregory suffered from a moderately severe impairment which constantly limited her ability to maintain attention and concentration to sufficiently complete tasks in a timely manner. (*Id.* at 5) According to Dr. Dickinson, Gregory's complaints of pain were consistent with her objective findings, and Gregory's impairment would result in absences of more than two days per month. (*Id.*) Dr. Dickinson indicated that Gregory would be limited to sedentary work, lifting a maximum of ten pounds. (*Id.* at 6) Dr. Dickinson's treatment records consist of lab work reports showing that Gregory was often noncompliant with her medications. (*See, e.g.*, D.I. 21-7 at 43)

Gregory also treated for right carpal tunnel syndrome prior to her amended onset date of August 7, 2013. (D.I. 21-7 at 26) In January 2012, Gregory was prescribed a wrist splint to ease the pain in her right hand. (*Id.*) In October 2014, Gregory went to her primary care physician for clearance prior to her scheduled carpal tunnel surgery. (D.I. 21-9 at 73) However, nothing in Gregory's medical records confirms that the surgery went forward, and there is no evidence in the medical records of objective testing to confirm the diagnosis of carpal tunnel syndrome.

4

On August 7, 2013, Gregory began treating with rheumatologist Maged I. Hosny, M.D. (D.I. 21-9 at 26-30) Dr. Hosny indicated that Gregory's symptoms of dull aching widespread pain were consistent with chronic fibromyalgia. (*Id.* at 28) Gregory experienced generalized body stiffness, widespread arthralgia and myalgia, as well as insomnia, fatigue, and lack of concentration. (*Id.*) Gregory's gait was normal, and she had a full range of motion and tenderness, but no visible swelling or effusion, in the joints of her bilateral upper and lower extremities. (*Id.* at 29) Her lab results revealed abnormal levels of ESR and CRP,[1] but she lacked clinical features of autoimmune or inflammatory conditions. (*Id.* at 30) Gregory was prescribed an increased dosage of Gabapentin, but remained symptomatic. (*Id.* at 25-26) Gregory exhibited normal muscle tone, strength, and range of motion in treatment notes through January 2016, and she continued to manage her pain with Gabapentin. (*Id.* at 82-98)

On November 20, 2013, Gregory saw Patricia Chavarry, D.O., for a consultative examination regarding Gregory's fibromyalgia, major depression, anxiety disorder, right carpal tunnel syndrome, cervical radiculopathy, lumbar radiculopathy, status post shoulder repair, obesity, hypertension, and insomnia. (D.I. 21-9 at 34-43) A physical examination revealed that Gregory walked with a normal gait and did not require the use of an assistive device. (*Id.* at 36) Gregory had pain extending through her cervical and thoracic regions and focal tenderness in both shoulders but no focal edema. (*Id.* at 37) She had full muscle strength in her upper and lower extremities and her muscle tone was intact. (*Id.*) Dr. Chavarry detected no gross cognitive impairment, and she described Gregory's mood and affect as normal. (*Id.*) Dr. Chavarry opined

---

[1] Laboratory testing for erythrocyte sedimentation rate ("ESR") and C-reactive protein ("CRP") is performed to reveal inflammatory activity in the body. *See* https://www.mayoclinic.org/tests-procedures/sed-rate/about/pac-20384797; https://www.mayoclinic.org/tests-procedures/c-reactive-protein-test/about/pac-20385228.

5

that Gregory did not have any physical restrictions that would prevent her from performing light duty work. (*Id.* at 38)

From July 2013 through September 25, 2015, Gregory treated with primary care physician Vineet Puri, M.D. (D.I. 21-9 at 51-80) Dr. Puri's records consistently reflect that Gregory exhibited a normal gait, normal range of motion, and full strength in all extremities. (*Id.* at 52, 55, 58, 61, 64, 67, 69) During her visit on December 13, 2013, Gregory indicated that she wished to discontinue her pain management, claiming it was not effective. (*Id.* at 51)

On November 26, 2013, Vinod K. Kataria, M.D., a State Agency medical consultant, opined that Gregory is capable of light work with a limitation of four hours of standing and walking, occasional postural limitations, and environmental limitations. (D.I. 21-3 at 31-32) Dr. Kataria opined that Gregory's statements about the severity of her symptoms were not supported by the objective medical evidence. (*Id.*) On February 21, 2014, Karen Sarpolis, M.D., a State Agency medical consultant, also opined that Gregory is capable of light work, and can stand or walk for four hours and sit for about six hours of an eight-hour workday. (*Id.* at 59-61)

### C.    Hearing Before the ALJ

#### 1.  Gregory's testimony

Gregory testified that she lives with her husband and adult daughter. (D.I. 21-2 at 42) She has a driver's license and is able to drive locally. (*Id.*) Gregory stated that she has a bachelor's degree in behavioral science and previously worked as a teacher's aide, and also as a treatment coordinator and case manager for foster children. (*Id.* at 43-44)

Gregory testified that she is unable to work primarily due to insomnia caused by chronic pain from her fibromyalgia. (*Id.* at 44-45) According to Gregory, she experiences pain in her lower back, legs, neck, arms, and hands. (*Id.* at 45) Gregory explained that her medications

make her drowsy. (*Id.*) Gregory does not participate in any type of physical therapy or exercise program. (*Id.* at 50) She reported that she sometimes uses a crutch to assist her with walking around the house, but she does not use it outside the home. (*Id.* at 46) Gregory indicated that she is able to walk for about ten to fifteen minutes while grocery shopping before taking a break, she is able to stand for about the same length of time, and she can sit for about fifteen to twenty minutes at a time. (*Id.* at 46-48)

Gregory explained that on her bad days, she cannot get out of bed. (*Id.* at 47) On her good days, however, she is able to do light housekeeping and prepare food for herself. (*Id.*) Gregory testified that she is not able to sweep, mop, or vacuum, but she does laundry. (*Id.* at 49) Gregory indicated that she is occasionally able to do some gardening, such as pulling weeds. (*Id.* at 50) She estimated that she has approximately three to five bad days per month. (*Id.* at 47) Gregory reported that the arthritis in her hands makes it difficult for her to do paperwork or type on a keyboard, and she needs assistance when opening jars. (*Id.* at 48) Gregory estimated that she could lift and carry about three to five pounds without injuring herself. (*Id.*)

Gregory stated that she goes to church and visits with her parents, but she does not visit friends. (*Id.* at 49-50) She does not participate in recreational activities like going to movies, restaurants, or parks. (*Id.* at 50)

## 2. Vocational expert testimony before the ALJ

The ALJ posed the following hypothetical to the vocational expert ("VE"):

I'd like you to assume an individual the claimant's age, education, and work
history; who could perform work at the light exertional level; who can
occasionally climb ramps, stairs, ladders, ropes, and scaffolds; who can
occasionally balance, stoop, kneel, crouch, and crawl; who can have occasional
exposure to extreme cold, extreme heat, humidity, vibration, and hazards; and
who could perform work that requires no fast pace or strict production
requirements with occasional changes in the work setting. Could this individual
perform any of the claimant's past work?

7

(D.I. 21-2 at 54) The VE testified that at the light, unskilled level, the individual described

would be able to work in occupations including assembler, control worker, and folder, but would

not be able to perform past work. (*Id.* at 54-55)

The ALJ then posed the following to the VE:

> Now, I'd like you to add to that that the individual can frequently reach with the
> dominant right arm and can frequently handle and finger with the dominant right
> arm. How would that affect that person's ability to be employed, in addition to
> the other restrictions I gave you?

(*Id.* at 55) The VE testified that the additional limitation would preclude the folder position, but

the control worker position and the assembler position would still be feasible. (*Id.*) The VE also

noted an alternate listing at the light level of exertion of an order caller. (*Id.*)

The ALJ inquired if positions would be available at the sedentary level including the right

arm limitations. (*Id.* at 55-56) The VE responded that the hypothetical individual at the

sedentary level could work at a position as a surveillance-system monitor, a type-copy examiner,

and a table worker. (*Id.* at 56) However, the VE testified that absences of two days per month

would preclude work. (*Id.*)

On cross examination, Gregory's attorney asked whether there would be available work

for a hypothetical individual at the sedentary or light level who is limited to

> a sit-stand option every 15 minutes, with, say, about a 5 – between a 5- to 10-
> minute off-task break at those intervals, and that would be because of pain the
> person would be off task after the 15 minutes for about 5 to 10 minutes. Would
> they be able to do any of the jobs that you mentioned or any other work?

(*Id.* at 57) The VE stated that there would be no work for that individual. (*Id.*)

## D. The ALJ's findings

Based on the factual evidence in the record and the testimony of Gregory and the VE, the

ALJ determined that Gregory was not disabled under the Act for the relevant time period from

8

August 7, 2013 through the date of the ALJ's decision on April 1, 2016. (D.I. 10-2 at 21) The

ALJ found, in pertinent part:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2014.

2. The claimant has not engaged in substantial gainful activity since August 7, 2013, the amended alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: fibromyalgia; status post-right shoulder repair; obesity; and adjustment disorder (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can occasionally climb ramps, stairs, ladders, ropes, or scaffolds; can occasionally balance, stoop, kneel, crouch, and crawl; can frequently reach, handle, and finger with the dominant right arm; can have occasional exposure to extreme cold, extreme heat, humidity, vibration, and hazards; and can perform work with no fast pace or strict production requirements and with occasional changes in the work setting.

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on April 9, 1966, and was 47 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from August 7, 2013, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(D.I. 21-2 at 23-31)

## III.   STANDARD OF REVIEW

Findings of fact made by the ALJ, as adopted by the Appeals Council, are conclusive if they are supported by substantial evidence. *See* 42 U.S.C. §§ 405(g), 1383(c)(3) (2015). Judicial review of the ALJ's decision is limited to determining whether "substantial evidence" supports the decision. *See Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). In making this determination, a reviewing court may not undertake a de novo review of the ALJ's decision and may not re-weigh the evidence of record. *See id.* In other words, even if the reviewing court would have decided the case differently, the court must affirm the ALJ's decision if it is supported by substantial evidence. *See id.* at 1190–91.

Substantial evidence is defined as less than a preponderance of the evidence, but more than a mere scintilla of evidence. *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004) (quoting *Jesurum v. Sec'y of the United States Dep't of Health & Human Servs.*, 48 F.3d 114, 117 (3d Cir. 1995)). As the United States Supreme Court has explained, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). The Supreme Court also has embraced this standard as the appropriate standard for determining the availability of summary judgment pursuant to Federal Rule of Civil Procedure 56. "The inquiry performed is the threshold inquiry of determining whether there is the need for

10

a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

This standard mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. If "reasonable minds could differ as to the import of the evidence, however, a verdict should not be directed." *See id.* at 250–51 (internal citations omitted). Thus, in the context of judicial review under § 405(g):

[a] single piece of evidence will not satisfy the substantiality test if [the ALJ] ignores, or fails to resolve, a conflict created by countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion.

*Brewster v. Heckler*, 786 F.2d 581, 584 (3d Cir. 1986) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir. 1983)). Where, for example, the countervailing evidence consists primarily of a claimant's subjective complaints of disabling pain, the ALJ "must consider the subjective pain and specify his reasons for rejecting these claims and support his conclusion with medical evidence in the record." *Matullo v. Bowen*, 826 F.2d 240, 245 (3d Cir. 1990).

"Despite the deference due to administrative decisions in disability benefit cases, 'appellate courts retain a responsibility to scrutinize the entire record and to reverse or remand if the [Commissioner]'s decision is not supported by substantial evidence.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Smith v. Califano*, 637 F.2d 968, 970 (3d Cir. 1981)). "A district court, after reviewing the decision of the [Commissioner] may, under 42 U.S.C. § 405(g) affirm, modify, or reverse the [Commissioner]'s decision with or without remand to the [Commissioner] for rehearing." *Podedworny v. Harris*, 745 F.2d 210, 221 (3d Cir. 1984).

## IV. DISCUSSION

### A. Disability Determination Process

Title II of the Act affords insurance benefits "to persons who have contributed to the program and who suffer from a physical or mental disability." 42 U.S.C. § 423(a)(1)(D) (2015); *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). A disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A claimant is only disabled if his impairments are so severe that he is unable to do his previous work or engage in any other kind of substantial gainful work existing in the national economy. *Id.* § 423(d)(2)(A); *Barnhart v. Thomas,* 540 U.S. 20, 21–22 (2003). To qualify for disability insurance benefits, a claimant must establish that he was disabled prior to the date he was last insured. 20 C.F.R. § 404.131 (2016); *Matullo v. Bowen*, 826 F.2d 240, 244 (3d Cir. 1990).

The Commissioner must perform a five-step analysis to determine whether a person is disabled. *See* 20 C.F.R. §§ 404.1520, 416.920; *Plummer v. Apfel*, 186 F.3d 422, 427–28 (3d Cir. 1999). If the Commissioner makes a finding of disability or non-disability at any point in the sequential process, the Commissioner will not review the claim further. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)(i). At step one, the Commissioner determines whether the claimant is engaged in any substantial gainful activity. *See id.* §§ 404.1520(a)(4)(i), 416.920(a)(4)(i) (mandating finding of non-disability when claimant is engaged in substantial gainful activity). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a severe combination of impairments. *See id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii) (mandating

12

finding of non-disability when claimant's impairments are not severe). If the claimant's impairments are severe, at step three, the Commissioner compares the claimant's impairments to a list of impairments that are presumed severe enough to preclude any gainful work. *See id.* §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Plummer*, 186 F.3d at 428. When a claimant's impairment or its equivalent matches a listed impairment, the claimant is presumed disabled. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to step four and five. *See id.* §§ 404.1520(e), 416.920(e).

At step four, the ALJ considers whether the claimant retains the residual functional capacity (the "RFC") to perform his past relevant work. *See id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv) (stating claimant is not disabled if able to return to past relevant work); *Plummer*, 186 F.3d at 428. A claimant's RFC is "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." *Fargnoli v. Halter*, 247 F.3d 34, 40 (3d Cir. 2001). The claimant bears the burden of demonstrating the inability to return to past relevant work. *See Plummer*, 186 F.3d at 428.

If the claimant is unable to return to past relevant work, at step five, the Commissioner must demonstrate that the claimant's impairments do not preclude him from adjusting to any other available work. *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (mandating finding of non-disability when claimant can adjust to other work); *Plummer*, 186 F.3d at 428. In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with his medical impairments, age, education, past work experience, and [RFC]." *Plummer*, 186 F.3d at 428. The ALJ must analyze the cumulative effect of all the claimant's impairments in determining whether he or she

is capable of performing work and is not disabled. *See id.* The ALJ often seeks the VE's assistance in making this finding. *See id.*

## B.    Whether the ALJ's Decision is Supported by Substantial Evidence

On April 1, 2016, the ALJ found Gregory was not disabled within the meaning of the Act from the amended alleged onset date of August 7, 2013, through the date of the decision. (D.I. 21-2 at 21) The ALJ concluded that, despite Gregory's severe impairments (fibromyalgia, status post-right shoulder repair, obesity, and adjustment disorder), she had the residual functional capacity to perform limited light work[2] and perform jobs that exist in significant numbers in the national economy. (*Id.* at 26-31) The ALJ further concluded that Gregory could occasionally climb ramps, stairs, ladders, ropes, or scaffolds; could occasionally balance, stoop, kneel, crouch, and crawl; could frequently reach, handle, and finger with the dominant right arm; could have occasional exposure to extreme cold, extreme heat, humidity, vibration, and hazards; and could perform work with no fast pace or strict production requirements and with occasional changes in the work setting. (*Id.* at 26) After considering the VE's testimony, the ALJ found that Gregory could not return to her past relevant work as a caseworker or a teacher's aide. (*Id.* at 30) However, the VE testified that Gregory could work as an assembler, a control worker, or an order caller.[3] (*Id.* at 31)

---

[2] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

[3] The VE testified that, nationally, there are 113,200 positions as an assembler, 91,800 positions as a control worker, and 82,400 positions as an order caller. (D.I. 21-2 at 31)

14

Gregory asserts three main arguments on appeal: (1) the ALJ erred in assessing

Gregory's credibility in light of the complex nature of fibromyalgia, (2) the ALJ failed to include

limitations accounting for Gregory's fibromyalgia and mental disorders in his determination of

Gregory's RFC, and (3) the ALJ erred as a matter of law in failing to accord adequate weight to

the opinion and assessment of Gregory's treating physician, Dr. Eva Dickinson. (D.I. 30 at 1-4)

### 1. Credibility / Fibromyalgia

Gregory argues that the ALJ erred in his assessment of her credibility in determining the

extent of her functional limitations stemming from her fibromyalgia. (D.I. 30 at 1-3) Social

Security Ruling 12-2p ("SSR 12-2p") provides "guidance on how we develop evidence to

establish that a person has a medically determinable impairment (MDI) of fibromyalgia (FM),

and how we evaluate FM disability claims and continuing disability reviews under titles II and

XVI of the Social Security Act." SSR 12-2p, 2012 WL 3104869 (July 25, 2012). In the present

case, the ALJ found that Gregory suffers from fibromyalgia and that her fibromyalgia constitutes

a severe impairment. (D.I. 21-2 at 23) Consequently, the ALJ complied with SSR 12-2p. *See*

*Linke v. Berryhill* , 2018 WL 3574912, at \*2-3 (W.D. Pa. July 25, 2018) (finding that the ALJ

complied with SSR 12-2p by finding that the plaintiff suffered from fibromyalgia and that it

constituted a severe impairment); *Rivera v. Comm'r of Soc. Sec.*, 2016 WL 4718143, at \*4

(D.N.J. Sept. 9, 2016) (concluding that "SSR 12-2p has no bearing on the ALJ's decision" if the

ALJ concludes that the plaintiff's fibromyalgia is a severe impairment).

Gregory emphasizes that her fibromyalgia symptoms do not "have physical appearances

so a physical exam would show *normal appearance* with *no visible signs* on most days." (D.I.

30 at 2) Courts have recognized the "unique difficulties associated with diagnosing

fibromyalgia, as there are no objective tests which conclusively confirm the disease." *Merritt v.*

*Berryhill*, 2018 WL 1162848, at *10 (E.D. Pa. Mar. 5, 2018) (citing *Green-Younger v. Barnhart*, 335 F.3d 99, 108 (2d Cir. 2003)). Due to the subjective nature of the diagnosis, the credibility of a claimant's testimony regarding her symptoms is especially significant in the ALJ's evaluation of the evidence. *Singleton v. Astrue*, 542 F. Supp. 2d 367, 378 (D. Del. 2008) (internal quotation marks and citations omitted). However, statements of pain alone are not enough to establish a disability; the claimant must also present objective medical evidence to show that the medical impairment "could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. §§ 404.1529(a); 416.929(a); SSR 96-7p. Consequently, "a claimant who has been diagnosed with fibromyalgia will not automatically be classified disabled under the Social Security Act." *Osborne v. Berryhill*, 2017 WL 818846, at *3 (W.D. Pa. Mar. 2, 2017). Instead, the ALJ must compare the objective evidence and the subjective complaints, and he may reject the plaintiff's subjective testimony if he provides a sufficient explanation for doing so. *Nocks v. Astrue*, 626 F. Supp. 2d 431, 446 (D. Del. 2009).

Substantial evidence supports the ALJ's assessment that Gregory's fibromyalgia could cause her symptoms, but the record does not support the intensity, persistence, and limiting effects of those symptoms to the extent alleged by Gregory. (D.I. 21-2 at 28) The ALJ found Gregory's complaints of bone and joint pain were not consistent with the medical findings of Dr. Puri and Dr. Hosny, which demonstrated that Gregory walked with a normal gait, had no visible swelling or effusion in any joint, had full muscle strength, and had a full range of motion in all of her joints. (D.I. 21-9 at 25-30, 51-98) Moreover, the consultative opinion by Dr. Chavarry in November 2013 supported the ALJ's opinion that Gregory had no physical restrictions that would prevent her from performing light work. (D.I. 21-2 at 29; D.I. 21-9 at 34-43) The ALJ explained that, to the extent that State Agency consultants Dr. Kataria and Dr. Sarpolis opined

16

Gregory would be limited to a total of four hours of standing and walking, this limitation was not supported by the medical examinations of Gregory's treating physicians consistently finding that Gregory had a normal gait. (D.I. 21-2 at 29; D.I. 21-3 at 31-32, 59-61)

In addition, the ALJ concluded that Gregory's daily activities do not support her alleged functional limitations stemming from her fibromyalgia. (D.I. 21-2 at 30) Specifically, the ALJ cited Gregory's testimony that she "is able to do light housekeeping and laundry," and she goes to church, maintains a driver's license, and visits with her parents. (D.I. 21-2 at 26) The ALJ also considered Gregory's October 22, 2013 adult function report outlining Gregory's activities of daily living, which indicates that Gregory drives a car, goes grocery shopping, and manages her finances. (D.I. 21-6 at 22-29)

Despite the ALJ's conclusion that Gregory's alleged functional limitations caused by her fibromyalgia were not supported by the medical evidence and other evidence of record, the ALJ accounted for Gregory's fibromyalgia in the RFC by imposing postural and environmental limitations. (*Id.*) The ALJ thoroughly discussed the evidence of record and determined that the RFC assessment accounted for Gregory's pain and other limitations. For these reasons, the ALJ's determination regarding Gregory's credibility in connection with her fibromyalgia is supported by substantial evidence.

### 2. Residual functional capacity

An RFC establishes the most an individual can do in a work setting despite impairments and limitations. 20 C.F.R. §§ 404.1545, 416.945. In making this finding, the ALJ must consider all of the claimant's impairments, including those that are not severe. Although the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence which he rejects and his reason(s) for discounting such evidence. *See Plummer*, 186 F.3d at 429.

Notwithstanding the fact that all evidence in the record must be considered, the ALJ has the exclusive responsibility for determining an individual's RFC. 20 C.F.R. § 404.1527(d)(2).

Gregory suggests that the ALJ erred in determining her RFC by failing to account for limitations on Gregory's ability to sit and stand for extended periods of time, her limited use of her upper extremities, and her moderate difficulties in maintaining concentration, persistence, and decision making. (D.I. 30 at 1) Substantial evidence supports the ALJ's RFC determination in the present case. For the reasons previously discussed at § IV.B.1, *supra*, the ALJ determined that Gregory's proposed sit/stand limitations were not consistent with the medical records showing she had a normal gait, normal range of motion, and normal strength in all of her extremities. (D.I. 21-2 at 29) The ALJ accounted for Gregory's impairment in her right upper extremity by "assigning light work with frequent reaching, handling, and fingering with the right arm, as well as additional postural and environmental restrictions." (*Id.* at 29) Moreover, the ALJ imposed limitations in the RFC to account for Gregory's difficulties in maintaining concentration, persistence, and pace[4] by expressly indicating that he "considered the claimant's adjustment disorder in assigning work with no fast pace or strict production requirements and occasional changes in the work setting." (*Id.* at 26, 28)

Gregory also identifies a litany of side effects from her medications which she alleges were not considered by the ALJ, including nervousness, restlessness, stomach ache, trouble sleeping, drowsiness, dizziness, fatigue, nausea, vomiting, constipation, sweating, memory loss, inability to concentrate, disorientation, depression, suicidal thoughts, anxiety, sedation, confusion, agitation, muscle cramps, lightheadedness, diarrhea, severe weakness, problems with

---

[4] The ALJ correctly noted that, "despite allegations of ongoing mental health symptoms, there is no evidence of mental health treatment during the relevant period other than medication prescribed by [Gregory's] primary care physician." (D.I. 21-2 at 28)

18

balance, muscle movement, acid reflux, and decreased libido. (D.I. 30 at 3) Many of these alleged side effects are not supported by the objective medical evidence or Gregory's own contemporaneous statements during routine doctor's visits.[5] The record before the court supports a finding that Gregory's medications caused drowsiness, forgetfulness, and difficulty focusing. (D.I. 21-9 at 10-15; D.I. 21-2 at 45) The ALJ made mention of the drowsiness Gregory experienced on her medications, but cited her activities of daily living in determining that medication side effects did not significantly restrict her ability to function. (D.I. 21-2 at 26) Nonetheless, the ALJ found that Gregory had moderate difficulties with regard to concentration, persistence, or pace, and accounted for these difficulties in the RFC by limiting Gregory to "work with no fast pace or strict production requirements and with occasional changes in the work setting." (D.I. 21-2 at 25-26)

Finally, Gregory contends that the ALJ failed to account for the number of absences she would require, which is work-preclusive pursuant to the testimony of the VE. (D.I. 30 at 3-4) The ALJ noted that Dr. Dickinson opined Gregory would be absent more than two days per month due to her impairments. (D.I. 21-2 at 28; D.I. 21-7 at 5) However, the ALJ afforded no weight to Dr. Dickinson's opinion because it was completed long before the amended alleged onset date and was not supported by Dr. Dickinson's own treatment records. (*Id.*) The ALJ's decision to afford no weight to Dr. Dickinson's opinion is supported by substantial evidence for

---

[5] At various points, Gregory indicated an intention to discontinue certain medications, including Gabapentin and Zanaflex, because she did not find them to be effective. (D.I. 21-9 at 91) In March 2015, Gregory indicated that she wished to stop taking all narcotics, but the record does not reflect that this was due to side effects. (*Id.* at 94) The record reflects that Gregory stopped taking Celebrex due to gastrointestinal side effects. (*Id.* at 88-89) However, she continued to take other medications for treatment of her impairments, and there is no indication on the present record that Gregory discontinued other medications due to side effects.

19

the reasons set forth at § IV.B.3, *infra*. The remaining evidence of record does not support a finding that Gregory requires more than two absences per month.

It is the ALJ's responsibility to make an RFC determination based on the medical evidence. 20 C.F.R. §§ 404.1527(e)(2), 404.1546(c). Here, substantial evidence supports the ALJ's RFC determination that Gregory could perform light work with additional limitations to account for her mental impairments, side effects of her medications, and postural and environmental sensitivities.

### 3. Opinion of Gregory's treating physician

Gregory argues that the ALJ failed to properly weigh the medical opinion of her treating physician, Dr. Eva Dicinkson. (D.I. 30 at 3-4) Gregory acknowledges that Dr. Dickinson proffered her opinion well before the amended disability onset date, but she claims that it was improper to afford Dr. Dickinson's opinion no weight because it accurately reflected Gregory's disability. *(Id.)*

To determine the proper weight to give a medical opinion, the ALJ is required to weigh all the evidence and resolve any material conflicts. *See Richardson v. Perales*, 402 U.S. 389, 399 (1971). Generally, the weight afforded to any medical opinion is dependent on a variety of factors, including the degree to which the opinion is supported by relevant evidence and consistent with the record as a whole. 20 C.F.R. §§ 404.1527(c)(3)-(4), 416.927(c)(3)-(4). To that end, the more consistent an opinion is with the record as a whole, the more weight is given to that opinion. *Id.* at §§ 404.1527(c)(4), 416.927(c)(4).

The ALJ must first assess whether a medical opinion is from a treating, non-treating, or non-examining source. 20 C.F.R. §§ 404.1502, 416.902; *see also Fletcher v. Colvin*, 2015 WL 602852, at *9 (D. Del. Feb. 11, 2015), *report and recommendation adopted*, 2015 WL 1284391

20

(D. Del. Mar. 19, 2015). The opinion of a treating physician who has an "ongoing treatment relationship" with the patient is entitled to special significance. 20 C.F.R. § 404.1502; *Fargnoli*, 247 F.3d at 43 (citing 20 C.F.R. § 404.1527(d)(2)). On the other hand, a treating physician's opinion does not warrant controlling weight if it is unsupported by clinical and laboratory findings, and if it is inconsistent with other substantial evidence. *See* 20 C.F.R. § 404.1527(c)(2); *Fargnoli*, 247 F.3d at 42-43. The more a treating source presents medical signs and laboratory findings to support the medical opinion, the more weight it is given. *See* *Robinson*, 137 F. Supp. 3d at 644. Likewise, the more consistent a treating physician's opinion is with the record as a whole, the more weight it should be afforded. *Id.*

An ALJ may not reject a treating physician's assessment based on his or her own credibility judgments, speculation, or lay opinion, and the ALJ cannot disregard a treating physician's opinion without explaining his or her reasoning or referencing objective conflicting medical evidence. *Morales*, 225 F.3d at 317; *Gilliland v. Heckler*, 786 F.2d 178, 184 (3d Cir. 1986). Even when the treating source opinion is not afforded controlling weight, the ALJ must determine how much weight to assign it by considering factors such as length, nature, and frequency of treatment visits, nature and extent of the treatment relationship, whether the opinion is supported by medical evidence, whether the opinion is consistent with the medical record, and the medical source's specialization. 20 C.F.R. §§ 404.1527(d), 416.927(d).

In the present case, the ALJ did not err in giving Dr. Dickinson's opinion no weight. The ALJ explained that Dr. Dickinson's opinion was completed well before the amended alleged onset date. (D.I. 21-2 at 28) "[I]f the treating physician's opinion does not relate to the period between the alleged onset date and the date last insured, the ALJ may find that the treating physician's opinion lack[s] probative value and accord it less weight." *Fuller v. Berryhill*, C.A.

No. 15-538-LPS, 2017 WL 1156747, at *6 (D. Del. Mar. 28, 2017). The record reflects that Dr. Dickinson treated Gregory between May 2011 and September 2012, and she completed the pain questionnaire on October 4, 2011, nearly two years before the amended alleged onset date. (D.I. 21-7; D.I. 21-8) Therefore, the ALJ did not err by assigning no weight to Dr. Dickinson's opinion. *See Franks v. Berryhill*, C.A. No. 15-381-CJB, 2017 WL 2705966, at *13 (D. Del. June 23, 2017) (holding that the ALJ did not err by failing to consider a treating physician's pre-onset date medical assessment).

The ALJ recognized Dr. Dickinson as a treating physician, but he observed that the limitations found by Dr. Dickinson were not supported by Dr. Dickinson's own treatment records. (D.I. 21-2 at 28) The record before the court supports the ALJ's findings to the extent that Dr. Dickinson's treatment notes do not contain recommended restrictions on Gregory's physical activity or ability to work. (D.I. 21-7; D.I. 21-8)

The ALJ further noted that Dr. Dickinson's treatment records document medication non-compliance. (D.I. 21-2 at 28) The ALJ does not explain how medication non-compliance affects Dr. Dickinson's findings. "[A]n ALJ may only rely on a lack of treatment compliance in making an adverse credibility finding after considering the reasons for the lack of compliance." *Brown v. Berryhill*, 2017 WL 1471385, at *8 (M.D. Pa. Apr. 25, 2017) (citing *Newell v. Comm'r of Soc. Sec.*, 347 F.3d 541, 547 (3d Cir. 2007)); *see also* SSR 96-7p, 1996 WL 374186, at *7 (stating that "the adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular treatment without first considering any explanations that the individual may provide."). Dr. Dickinson's treatment records do not clearly identify a reason for Gregory's noncompliance with medication. To the extent that the ALJ erred in relying on Gregory's lack of compliance without investigating the underlying reason, this

22

error is harmless in light of the additional reasons provided by the ALJ for affording no weight to Dr. Dickinson's opinion.

## V. CONCLUSION

For the foregoing reasons, I recommend that the court deny Gregory's motion for summary judgment (D.I. 25), and grant the Commissioner's cross-motion for summary judgment (D.I. 26).

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2). The objection and responses to the objections are limited to ten (10) pages each. The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the District Court. *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the court's Standing Order For Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the court's website, http://www.ded.uscourts.gov.

Dated: February 15, 2019

Sherry R. Fallon
United States Magistrate Judge